**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | | |
| | **)** | | |
| | **)** | | |
| **v.** | **)** | **Case No.** | **3:19-CR-220** |
| | **)** | | **Judge Thomas A. Varlan** |
| | **)** | | |
| **DARREN PAYNE** | **)** | | |

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF DARREN PAYNE**

## I.  INTRODUCTION

Darren Payne is a former college basketball player, high-school teacher, and basketball coach who had never been in trouble until he was prescribed opiates for over a year and a half related to a surgery to insert steel rods in his back to treat degenerative disc disease. When the prescriptions stopped, the addiction Mr. Payne developed did not. He began buying opiates off the streets to replace the pills that he had come to rely on as a daily part of his life. He maintained periods of sobriety in the years following his surgery, but the addiction – coupled with untreated depression – was unrelenting and pulled him back to opiate use. This led to Mr. Payne's separation from his wife, their later divorce, and his estrangement from their two children.

When Mr. Payne lost his wife and child, he also lost any remaining control of his addiction. His mental health sharply declined and he began taking Opana instead of Oxycodone. To support his $100+ day habit, he began selling drugs. He became addicted to heroin before he was introduced to methamphetamine by people who were using meth to get off opiates. When the people selling him meth were all eventually arrested, someone offered to front Mr. Payne meth and heroin to sell. He found that he was able to feed his addiction for little to no financial cost. There were other costs to Mr. Payne, though. His choices led to the current offenses of conviction.

1

Mr. Payne has accepted responsibility for, and pleaded guilty to, both counts of a two-count Superseding Indictment: conspiracy to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and conspiracy to distribute one kilogram or more of heroin and four hundred grams or more of a mixture and substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846.

For reasons discussed below, Mr. Payne respectfully requests that this Honorable Court impose a sentence of 30 months of incarceration, with the recommendation that he be incarcerated in a prison participating in the Federal Bureau of Prisons Residential Drug Abuse Program ("RDAP"), followed by a period of supervised release by granting Mr. Payne the following: (1) a three-level downward adjustment based on acceptance of responsibility; (2) an eight-level downward departure (a 26.6% departure from his base offense level) based on his substantial assistance to the United States Government under U.S.S.G. §5K1.1; (3) a two-level downward departure for being safety valve eligible, or in the alternative, a downward variance to compensate for the conflict between the statute and guidelines regarding safety valve; and (4) a downward variance based on an analysis under 18 U.S.C. § 3553(a).

## II. MR. PAYNE'S PERSONAL BACKGROUND AND THE BACKGROUND OF THE OFFENSES.

Mr. Payne's story is a cautionary tale for the dangers of over prescription of opiates and illustrates how nearly anyone can fall into a life of to addiction and criminal activity under the wrong circumstances. Mr. Payne grew up in Harriman, Tennessee, where the majority of his family still lives. His parents, Karen and Donnie Payne, are described by friends and family as loving and supportive. Mr. Payne has one older brother, Derrick Payne. When Mr. Payne was a child, he regularly attended church and was active in the youth group. He was well-liked, kind, and passionate about basketball, which he set his sights on playing and coaching. He began to realize

2

these goals, and after playing basketball in middle and high school, he was able to play college basketball at Cleveland State Community College.

The trajectory of Mr. Payne's life changed when he received his first daily prescription for Percocet in 2012. He was twenty-seven years old. At the time, he was a student at Tennessee Tech University working to complete his bachelor's degree in education. His goal was to become a teacher so that he could pursue his passion of helping children and coaching basketball. Even before he graduated college, he had a long history of community involvement coaching youth sports. He coached basketball while he was growing up and also coached football for several years.

Mr. Payne was receiving medical care in college because he suffered from degenerative disc disease. His back problems had progressed to a point where he experienced severe pain every day. In addition to the pain, after sitting or laying down his back would often lock up and he would be bedridden until he could move again after a period of rest. As a result, he often had difficulty getting out of bed in the mornings. The pain and struggles to function normally caused mental health issues to surface and he also experienced periods of depression. His doctors told him that surgery was necessary, but he wanted to finish his last semester of college before the procedure.

At the time, Mr. Payne was married, had a young daughter, and his wife had recently become pregnant with their second daughter. Below is a picture of his family from 2012, after his son was born.



Mr. Payne was a loving husband and father, but he was pushing himself to the limits. He had been attending classes in Cookeville, TN most days until 3:00 P.M. After that, he drove back to Oak Ridge, TN to coach basketball at Oakdale High School. He was an assistant coach but hoped it would lead to a head coaching position after he graduated college.

After coaching, he spent time with his family, slept, and then went to work from 12:00 AM to 8:00 AM at Emory Valley Center, a non-profit in Oak Ridge, where he provided care and assistance for elderly people with mental disabilities. His desire to develop a strong foundation for his family to pursue his passions kept him motivated to keep this difficult schedule – even in spite of the medical issues he was experiencing.

Approximately six or eight months before Mr. Payne graduated from Tennessee Tech, his doctors prescribed him Percocet to help him get by until his surgery. His pain went away, and his life changed. He no longer went to bed dreading the pain that he used to face every morning and he could juggle his schedule more easily. He could play with his daughter and enjoy time with his

4

wife again. He felt that his life was back to normal. During this time, Mr. Payne took multiple Percocets a day – one to two pills every four hours as prescribed by his doctor. Before his graduation, his doctors changed his prescription to one or two Oxycodone 10mg every four hours daily.

After his college graduation, Mr. Payne scheduled his back surgery. After the surgery, during which doctors fused two of Mr. Payne's vertebrae, his doctors increased his Oxycodone prescription to one or two 15mg pills every four hours, daily. Although the surgery helped with his back pain, it created new problems in his life. While recovering physically, he could feel his dependence on the pills increasing. He no longer felt liberated by the pills but instead craved them.

At the same time, his symptoms of depression began to affect him more. Mr. Payne saw his primary care physician, Dr. Rodney McMillan, who diagnosed him with depression and prescribed Wellbutrin. Mr. Payne ultimately stopped taking Wellbutrin after a short time though, as he felt that the side effects made him feel worse than he did without the medication.

The combination of the addiction and mental health issues strained Mr. Payne's relationship with his wife, though some of their problems pre-dated these issues. Mr. Payne and his wife married young. He was twenty-one years old and she was twenty. She quickly became pregnant with their first daughter. While Mr. Payne was in college, his wife cheated on him. They tried to work through it, but lingering trust issues pervaded the rest of their relationship and weighed heavily on Mr. Payne.

Mr. Payne was prescribed Oxycodone 15mg for approximately a year after the surgery. He took these pills as prescribed and was not using any other illegal substances. Then, seemingly randomly, Mr. Payne went to his doctor to get a refill on his prescription and his doctor told him they had decided they were not going to prescribe him anymore opiates. After being prescribed

opiates for approximately eighteen months total, the doctors rapidly weaned him off without any apparent concern for opioid dependence and the consequences for Mr. Payne.

Almost immediately, Mr. Payne began buying and using Oxycodone illegally. In the beginning of this downward spiral, Mr. Payne tried to keep the pieces of his life together. It was a chaotic time in his life. After graduation, he had obtained a job as a teacher at Harriman Middle School where he taught math, science, and special education classes. On one hand, he was pursuing his dreams. He was teaching full-time, coaching high school basketball, and mentoring children. He would put on free basketball clinics for elementary school children and felt like he was helping his community. But on the other hand, he was barely keeping his marriage together and losing control of his addiction. He felt a lot of shame from his internal conflict of wanting to be an educator, coach, and role model while also illegally buying and using opiates – the same drugs that he had been legally using only a short time before. These feelings contributed to his already declining mental health.

While Mr. Payne was struggling with his addiction, he felt like he had no support system. His wife didn't understand addiction and felt that he didn't need the pills even when he was in constant pain before the surgery. As a result, she became distrustful of Mr. Payne and often accused him of lying about his opiate use – often she was right. His parents knew that he was dealing with marital issues, but he hid the primary cause of those issues from them. Mr. Payne realized later that his addiction made him numb to the marital issues, and that they might have worked through their issues but for his drug use.

After approximately a year, Oxycodone became difficult to find on the streets and Mr. Payne began buying and using Opana, which was more prevalent. After a few more months, he started struggling to financially support his addiction. At the time, he was taking one or two Opana

6

40mg per day at a cost of $120 per pill. He found that heroin was readily available and cheaper, so he started snorting heroin to feed his addiction.

Everything was unraveling for Mr. Payne. He had quit his job as a teacher and started working for his father because he could no longer hide his drug use. He and his wife separated. Mr. Payne ultimately had to tell his parents about his struggles with addiction. With their assistance, he entered Cornerstone of Recovery Treatment Center and completed an in-patient program. Mr. Payne did maintain sobriety for a time after completing the program but relapsed after a few months. Contributing to his relapse was that Mr. Payne and his wife divorced in 2018, and during their separation, his wife kept his children away from him. He knows now that he was responsible for creating that situation, but it deeply hurt him at the time and pushed him further away from his family and back to drug use.

Mr. Payne used heroin for approximately a year, then other addicts on the streets introduced him to methamphetamine as a way to curb his opiate use. Mr. Payne began selling drugs when his primary supplier got arrested and someone offered to front him meth and heroin to sell. By then, Mr. Payne was not working – he was fully immersed in his addiction – and he began selling meth and heroin to support himself and his own personal drug use. These decisions, coupled with his addiction, led to his current offenses of conviction. On February 18, 2020, he was arrested and charged in the present case. He pleaded guilty on June 21, 2021 and has been in continuous custody since.

III. **A SENTENCE OF 30 MONTHS OF INCARCERATION, FOLLOWED BY A PERIOD OF SUPERVISED RELEASE, WITH THE RECOMMENDATION THAT Mr. PAYNE BE INCARCERATED IN A PRISON PARTICIPATING IN THE RDAP PROGRAM IS AN APPROPRIATE SENTENCE IN THIS CASE.**

Mr. Payne respectfully requests that this Court impose a sentence of 30 months of incarceration, with the specific recommendation that he be incarcerated in a prison participating

in the RDAP program, followed by a period of supervised release by granting Mr. Payne the following: 1) a three-level downward adjustment based on acceptance of responsibility; (2) an eight-level downward departure (a 26.6% departure from his base offense level) based on his substantial assistance to the United States Government under U.S.S.G. §5K1.1; (3) a two-level downward departure for being safety valve eligible, or in the alternative, a downward variance to compensate for the conflict between the statute and guidelines regarding safety valve; and (4) a downward variance based on an analysis under 18 U.S.C. § 3553(a).

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), these sentencing guidelines are advisory, rather than mandatory, and sentencing courts are permitted to set each sentence, in accordance with other statutory considerations, in a particularized manner for each defendant's circumstances.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court outlined the three-step process a sentencing court should follow when imposing a sentence. First, the court must properly determine the guideline range. *Gall*, 552 U.S. at 49. Second, the court must determine whether a departure is warranted to adjust the applicable guideline range. *Id.* at 50. Finally, the court must consider all the factors set forth in 18 U.S.C. § 3553(a). *Id.*

**A.   Mr. Payne's base offense level is 30 – a three-level adjustment for acceptance of responsibility results in an offense level of 27.**

According to the Presentence Investigation Report ("PSR") prepared in this case, Mr. Payne's base offense level is 30 with a criminal history category of III, resulting in a Zone D sentence. *See* PSR [Doc. 479] p. 8. The PSR recognizes that a three-level adjustment for Acceptance of Responsibility is appropriate, resulting in an adjusted offense level of 27. *See* PSR [Doc. 479] p. 9.

**B. Mr. Payne should be sentenced without regard for a mandatory minimum sentence because he is safety-valve eligible.**

Mr. Payne's offenses of conviction result in a mandatory minimum sentence of 120 months with a 60-month period of supervised release. However, Mr. Payne respectfully submits to this Court that the minimum mandatory is not applicable in this case because Mr. Payne is Safety Valve eligible.

18 U.S.C. § 3553(f) provides that "the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that" the defendant meets the following criteria:

> The defendant does not have more than 4 criminal history points or a prior three or two point offense;
>
> The defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense;
>
> The offense did not result in death or serious bodily injury to any person;
>
> The defendant was not an organizer, leader, manager, or supervisor of others in the offense, and was not engaged in a continuing criminal enterprise; and
>
> The defendant truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or a common scheme or plan.

18 U.S.C. §3553(f)(1)-(5) (paraphrased).

The PSR recognizes a discrepancy between 18 U.S.C. §3553(f) and the United States Sentencing Commission Guidelines regarding "safety valve" eligibility and its effect on a defendant's sentence. *See* PSR, [Doc. 479] at p. 16, n. 2, p. 21.

U.S.S.G. §5C1.2 limits the applicability of statutory minimum sentences in certain cases

and differs from 18 U.S.C. §3553(f) by requiring that a defendant must not have more than one criminal history point to be safety valve eligible. The First Step Act of 2018 (P.L. 115-334) amended 18 U.S.C. § 3553(f) to allow an individual to receive the benefit of the safety valve provision if he has four criminal history points or less. The Sentencing Guidelines were not updated to reflect this change.

So, if one looks only to the §5C1.2 of the Sentencing Guidelines, Mr. Payne would not qualify for a safety-valve sentence because he has four criminal history points. However, it is apparent that U.S.S.G. §5C1.2 was intended to implement the safety-valve statute – 18 U.S.C. § 3553(f), not to create new or different criteria to determine the length of a sentence. The background notes of USSG §5C1.2 explain that the section "sets forth the relevant provisions of 18 U.S.C. §3553(f)…which limit the applicability of statutory minimum sentences in certain cases…. [T]he Commission has promulgated application notes to provide guidance in the application of 18 U.S.C. § 3553(f)."

A conflict between the Guidelines and a statute is resolved in favor of "the specific directives of Congress." *United States v. Labonte*, 520 U.S. 751, 758 (1997) ("Congress has delegated to the Commission 'significant discretion in formulating guidelines' for sentencing convicted federal offenders. Broad as that discretion may be, however, it must bow to the specific directives of Congress….If the Commission's revised commentary is at odds with [the statute's] plain language, it must give way."). Congress amended §3553(f) to expand safety valve eligibility to defendants with four or fewer criminal history points – the Sentencing Guidelines cannot define safety valve eligibility differently. Thus, when determining whether a mandatory minimum sentence applies in Mr. Payne's case, it is appropriate for the Court to rely on the criteria established in 18 U.S.C. § 3553(f), not U.S.S.G. §5C1.2.

Mr. Payne fits the criteria of the amended statute and should be sentenced without regard for a statutorily required mandatory minimum sentence. Mr. Payne's criminal history points do not exceed four and none of his prior offenses constituted a three or two-point offense. *See* PSR, [Doc. 479] at p. 12. There is no allegation that Mr. Payne ever used violence, made threats, or possessed a firearm or other dangerous weapon as part of his offense. The PSR states there is no victim in this case and there are no allegations of death or serious bodily injury to any person as a result of Mr. Payne's actions. *See* PSR, [Doc. 479] at p. 7. Paragraph 31 lists only two other co-defendants who were identified as leaders in this case. *See* PSR, [Doc. 479] at p. 7. Finally, Mr. Payne debriefed with the United States and it is believed that the United States will move the Court for a downward departure pursuant to U.S.S.G. §5K1.1.

Therefore, Mr. Payne submits to this Court that he would be eligible for the statutory "safety valve" and should receive the benefit of the amendments to the statute and be sentenced without regard for any mandatory minimum sentence.

**C.     Mr. Payne is eligible for a downward departure based on U.S.S.G. §5K1.1 and also for an additional two-level downward departure as a safety-valve eligible offender pursuant to U.S.S.G. §2D1.1(b)(18).**

Mr. Payne submits to this Court that he is eligible for two downward departures that lower his applicable guidelines range. Both are discussed in Mr. Payne's PSR: a downward departure based on U.S.S.G. §5K1.1 for substantial assistance and a downward departure for being "Safety Valve" eligible pursuant to U.S.S.G. §2D1.1(b)(18). Mr. Payne submits that the combination of these departures should result in an offense level of 17, with a sentencing range of 30-37 months.

**1.     Mr. Payne should receive an eight-level downward departure for substantial assistance under U.S.S.G. §5K1.1.**

Mr. Payne has provided substantial assistance to the Government, and it is believed that the Government will recommend that Mr. Payne receive a downward departure for his substantial

assistance. Should the Government recommend a departure pursuant to USSG §5K1 as Mr. Payne expects, a significant downward departure is warranted.

The PSR identified U.S.S.G. §5K1.1 – substantial assistance to authorities – as a potential ground for downward departure in Mr. Payne's case. [Doc. 479] at p. 21. U.S.S.G. §5K1.1 states that:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
>
> (a)     The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:
>
> (1)     the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2)     the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3)     the nature and extent of the defendant's assistance;
>
> (4)     any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5)     the timeliness of the defendant's assistance.

Mr. Payne has cooperated with the Government since the early stages of this case and has provided as much truthful information and assistance as has been asked of him while putting himself at risk. *See* PSR, [Doc. 479] at p. 21. Should the Government make this recommendation, Mr. Payne respectfully submits that the Court should grant a downward departure of eight offense levels – a 26.6% downward departure from his base offense level of 30.[1] The Court may also rely

---

[1] At this time, the Government has not recommended a particular offense level departure under §5K1.1. If the Government recommends a lesser or greater departure, Mr. Payne respectfully submits that a variance pursuant to 18 U.S.C. §3553(a) is appropriate and should result in a similar final applicable guidelines range to an eight-level §5K1.1 departure.

on his substantial assistance as an additional basis to sentence him below the mandatory minimum sentence. *See* 18 U.S.C. § 3553(e); USSG §5K1.1, Application Note 1.

### 2. Mr. Payne should receive a two-level downward departure for safety valve eligibility under U.S.S.G. §2D1.1(b)(18)

As discussed above, Mr. Payne respectfully submits to this Court that he meets the criteria to be "safety-valve" eligible pursuant to 18 U.S.C. § 3553. In addition to sentencing Mr. Payne without regard to a mandatory minimum sentence, it is also appropriate to apply a two-level reduction to Mr. Payne's base offense level pursuant to USSG §2D1.1(b)(18), which states, "if the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (1) of §5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels." In other words, if a defendant is safety valve eligible, then he should also be given a two-level sentence reduction under USSG §2D1.1(b)(18).

The discrepancy between 18 U.S.C. §3553(f) and U.S.S.G. §5C1.2 – discussed above – also applies to the application of this two-level downward departure. The PSR suggests that "as a matter of proper guideline application, the two-level safety valve reduction found in USSG §2D1.1(b)(18) only applies if the defendant meets the criteria as provided in USSG §5C1.2." [Doc. 479] at p. 22. The PSR also suggests that, because of the discrepancy between the statute and the Guidelines, the Court may find that a two-level variance is warranted in Mr. Payne's case. *Id.*

For the reasons discussed in §2.A of this memorandum, Mr. Payne suggests that proper guideline application results in a two-level *departure*, rather than a two-level *variance*. The Legislative intent was that the criteria in 18 U.S.C. §3553(f) define safety-valve eligibility, and in the event of a conflict between the Sentencing Guidelines and the relevant statute, the statute controls. *Labonte*, 520 U.S. at 758. Should the Court hold otherwise, Mr. Payne respectfully requests that the Court grant a downward variance to a degree at least equal to the number of

Case 3:19-cr-00220-TAV-DCP   Document 675   Filed 06/17/22   Page 13 of 21   PageID #: 4666

months a two-level departure would provide, notwithstanding an analysis of the 3553(a) factors, and in consideration of the conflict and the Legislative intent of the First Step Act of 2018. *See* PSR [Doc. 479] at p. 22.

### 3. In total, Mr. Payne should receive a ten-level reduction in his offense level based on the applicable departures.

If the Government recommends a downward departure pursuant to U.S.S.G. § 5K1.1, Mr. Payne respectfully submits to this Court that his substantial cooperation is worth a reduction of eight levels. With the two-level reduction for being safety valve eligible, Mr. Payne may receive an ten-level departure, resulting in an offense level of 17 and resulting in an applicable guidelines range of 30-37 months.

## IV. APPLICATION OF THE 18 U.S.C. § 3553(A) FACTORS WARRANTS A DOWNWARD VARIANCE IN MR. PAYNE'S CASE TO RESULT IN A TOTAL SENTENCE OF 30 MONTHS OF IMPRISONMENT, FOLLOWED BY A PERIOD OF SUPERVISED RELEASE.

This Court may adjust Mr. Payne's guidelines range through departures and variances. This Court may grant a downward variance after all relevant departure provisions have been considered. *Gall*, 552 U.S. at 49. When determining whether to grant a variance, this Court uses the 18 U.S.C. § 3553(a) factors to guide its analysis. *See United State v. Grams*, 566 F.3d 683, 686-87 (6th Cir. 2009) (differing from a departure, "a 'variance' refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of §3553(a).").

Under 18 U.S.C. § 3353(a), the Court shall "impose a sentence, sufficient, but not greater than necessary to comply with the following purposes:"

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

14

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3353(a)(2).

In addition to these purposes, 18 U.S.C. § 3353(a) instructs that, when determining the particular sentence to be imposed, the Court shall also consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kind of sentencing available; (4) the kinds of sentence and the sentencing range established for the type of offense committed by the defendant as set forth in the United Stated Sentencing Guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Further, pursuant to 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statute overrides the policy statements in Part H of the Sentencing Guidelines which list numerous factors such as the defendant's age, educational level, vocational skills, mental and emotional condition, or drug or alcohol dependence as not ordinarily relevant.

Mr. Payne submits that a consideration of the factors in 18 U.S.C. §3553(a) should result in a finding that, in Mr. Payne's circumstances and with consideration of applicable departures and variances, a sentence of 30 months fulfils the sentencing principles that the Court impose a sentence that is not than necessary to reflect the seriousness of the offense, promotes respect for the law, and provides just punishment of the offense.

**A.   The nature and circumstances of the offense and the history and characteristics of Mr. Payne.**

Mr. Payne has accepted responsibility for, and pleaded guilty to, conspiracy to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and conspiracy to distribute one kilogram or more of heroin and four hundred grams or more of a mixture and substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846.

While the quantity and types of drugs involved in this case are undoubtedly serious, Mr. Payne's criminal conduct was that of a desperate, sick, and struggling addict. As discussed above, Mr. Payne was one of the many East Tennesseans whose drug addiction started in a doctor's office and was fueled by pain and mental health issues. Before his struggles with his opiate addiction, Mr. Payne was a law-abiding citizen. It is also important to note that Mr. Payne never used force, threats, or weapons during his offenses of conviction. These personal circumstances warrant a downward variance.

Further, when Mr. Payne was arrested and charged in this case, he provided as much information as he could to the Government about his conduct and the criminal conspiracy. It is appropriate to apply a downward variance for assisting the Government even if the Government does not file a motion for downward departure under U.S.S.G. §5K1.1. *See United States v. Massey*, 663 F.3d 852, 858 (6th Cir. 2011) (the sentencing court "retains the discretion to take into account a defendant's cooperation as a § 3553(a) mitigating factor" (citing *United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009)). Mr. Payne submits to this Court that his cooperation, including two full debriefing sessions, justifies a downward departure.

**B.      The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

Mr. Payne recognizes the impact that his actions have had on the community, his family and friends, and on his own life. A sentence of 30 months of imprisonment is appropriate to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.

The personal cost of this case to Mr. Payne has been great. His life has been on a downward trajectory for over five years. As a formerly prominent and now infamous member of his community, Mr. Payne has become a warning story for his community about the disastrous effects of addiction and criminal activity. By all accounts, Mr. Payne was raised in as loving a home as one could have, was an active member in the church, and no one who knows Mr. Payne or his family would have predicted that he would one day be in this position. Before he succumbed to his addiction and began selling drugs, he was a well-loved member of the community. He had worked extremely hard to graduate college and had reached his goals of teaching and coaching basketball – he was a role model for the children that he coached. Now, he is a felon who will have a serious uphill climb in order to ever coach youth sports or teach again. However, should Mr. Payne be able to surmount this obstacle – which he can with family support and proper mental health and addiction treatment – his difficult journey may eventually allow him to be a meaningful ambassador to youth and help them stay on a drug-free path.

Further, because of his addiction and his actions, he and his wife divorced, and he must attempt to rebuild his relationships with his children – who have now spent much of their formative years without their father. He may never get those relationships back.

None of this is to say that Mr. Payne seeks to minimize his conduct. But his criminal activity has come at great personal cost, and he seeks to now attempt to rebuild his life and regain the trust of his family and community with the assistance of the resources available through RDAP

and supervised release. It is not necessary to further emphasize the seriousness of this case by imposing a lengthy sentence of incarceration – Mr. Payne and those who know him have seen the suffering he caused himself and those who love him.

Sentencing Mr. Payne outside of his applicable guidelines range and to 30 months of incarceration would be sufficient to reflect the seriousness of the offense, promote respect for the rule of law, and provide Mr. Payne with just punishment.

**C.**    **The need for the sentence imposed to afford adequate deterrence to criminal conduct.**

This Court must consider both general deterrence for the public-at-large as well as specific deterrence for this defendant. Under 18 U.S.C. §3553(a)(2), the Court shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct. A sentence of 30 months of incarceration, a term of supervised release, and the recommendation that he complete RDAP is an effective sentence to deter future criminal conduct from Mr. Payne.

Further, this case communicates the consequences of the case to the public at large. As discussed above, Mr. Payne's story is a cautionary tale to his community about how far someone can fall. Any sentence greater than 30 months, as recommended by the guidelines, will not provide any additional deterrence to Mr. Payne or the public.

**D.**    **The need for the sentence imposed to protect the public from further crimes of the defendant.**

Mr. Payne has not used illegal drugs since he was arrested and charged in this case. This is his longest period of sobriety, and he is committed to maintaining that sobriety. A sentence involving RDAP and supervised release will ensure that Mr. Payne continues this upward trajectory. Further, while incarcerated, Mr. Payne has received consistent mental health treatment for the first time in his life, and he reports that he feels better while taking his current medications.

Mr. Payne's history – before he became addicted to drugs – demonstrates that he has the ability to be a productive member of society. He had no criminal history other than traffic offenses prior to his conviction for simple possession of methamphetamine in Roane County, Tennessee in 2017. Shortly after, he pleaded guilty to a misdemeanor forgery charge (a simple possession charge was dismissed) in 2018 in Dekalb County, Georgia. Mr. Payne's history of criminal activity (other than two traffic offenses) did not begin until he was thirty-two years old, and it is all non-violent and drug related. With RDAP, addiction/mental health-oriented conditions of release, and his familial support, there should be little concern that Mr. Payne would engage in future activity.

### E. The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Under 18 U.S.C. 3553(a)(2) this Court must consider the need for the sentence imposed to provide a defendant with necessary educational or vocational training, medical care or other correctional treatment in the most effective manner. Mr. Payne submits that he is an ideal candidate for the Federal Bureau of Prisons Residential Drug Abuse Program. *See* 18 U.S.C. § 3621(e); 28 C.F.R. § 550.50, *et seq.* 28 C.F.R. § 550.53(b) provides that for inmates to qualify for the RDAP program that must have a verifiable substance use disorder, must sign an agreement acknowledging the program responsibility, and when an inmate begins the program, they must be able to complete the three components of the program which are:

> (1) Unit-based component. Inmates must complete a course of activities provided by the Psychology Services Department in a treatment unit set apart from the general prison population. This component must last at least six months. (2) Follow-up services. If time allows between completion of the unit-based component of the RDAP and transfer to a community-based program, inmates must participate in the follow-up services to the unit-based component of the RDAP. (3) Community Treatment Services (CTS). Inmates who have completed the unit-based program and (when appropriate) the follow-up treatment and transferred to a community-based program must complete CTS to have successfully completed RDAP and receive incentives. The Warden, on the basis of his or her discretion,

19

may find an inmate ineligible for participation in a community-based program; therefore, the inmate cannot complete RDAP.

28 C.F.R. § 550.53(b).

Mr. Payne meets the admission criteria for the program that are set forth in 28 C.F.R. § 550.53(b). He honestly and candidly discussed his substance abuse with his probation officer, and his history of drug addiction is described in the PSR. [Doc. 479] at p. 14-15. He first used marijuana as a teenager and used cocaine when he was 21 or 22 years old. *Id*. at p. 14. But as discussed above, he did not use drugs as an addict until he was prescribed opiates prior to and after a back surgery. *Id*. This began an eight year downward spiral of addiction that resulted in heavy meth and heroin use. *Id*. at p. 15. Mr. Payne expressed that he would "absolutely love" to participate in additional treatment opportunities while in custody. *Id*. at p. 14. He has a verifiable substance use disorder that qualifies him for RDAP. *See* 28 C.F.R. 550.53(b).

Importantly, Mr. Payne has been incarcerated while awaiting sentencing. This incarceration has punished Mr. Payne, but it has also given him time to be drug-free, to receive mental health treatment, and to prepare himself for rehabilitation. Mr. Payne's criminal history is related to his drug addiction, but his background and his support system demonstrate that he can successful with maintaining sobriety and lawful behavior if he is given the tools to overcome addiction.

Participating in RDAP will give Mr. Payne the opportunity rehabilitate himself and be poised to return to society upon his release from custody. It is respectfully requested that this Court recommend that Mr. Payne complete RDAP and be housed at a facility that would allow him to participate in RDAP.

**V.      CONCLUSION**

For these reasons, and for all the reasons stated above, Mr. Payne respectfully submits that

a sentence of 30 months of incarceration, followed by supervised release, with the recommendation from this Court that he complete the Federal Bureau of Prisons Residential Treatment Program is sufficient, but not greater than necessary, to accomplish the goals of 18 U.S.C. § 3553.

Respectfully submitted,

 s/Marcos M. Garza
Marcos M. Garza, BPR # 021483
Daniel B. Morrell, BPR # 34365
Dominic A. Gardo, BPR # 038518
Daniel T. Woodard, BPR # 039575
GARZA LAW FIRM, PLLC
550 West Main Street, Suite 340
Knoxville, Tennessee 37902
(865) 540-8300, Fax: (865) 474-9397
info@garzalaw.com

s/Tyler M. Caviness
Tyler M. Caviness, BPR # 036273
STEPHENS, DIRADO & CAVINESS, LLP
606 W Main Street, Suite 250
Knoxville, TN 37902
(865) 545-0909, Fax: (865) 545-0902
tyler@sdsclaw.com
*Attorneys for Mr. Payne*

## CERTIFICATE OF SERVICE

I, Marcos M. Garza, attorney for Darren Payne, hereby certify that a copy of this notice was filed electronically on June 17, 2022. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this document through the Court's electronic filing system.

This the 17th day of June, 2022.

s/ Marcos M. Garza
MARCOS M. GARZA

21